**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:08 MD 1932**

| | | |
|---|---|---|
| SHAWN ERIC WARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| FAMILY DOLLAR STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER** is before the Court on Defendant's Motion for Summary Judgment and Memorandum in Support (Doc. No. 264); Plaintiffs' Response in Opposition (Doc. No. 353); and Defendant's Reply (Doc. No. 383).[1] For the reasons set forth below, the motion is **GRANTED**.

---

[1] Plaintiff's case comes before this Court as part of a proposed collective action with Shawn Eric Ward as lead plaintiff. On January 22, 2008, this Court denied plaintiffs' Motion to Facilitate Notice. (3:06cv441, Doc. No. 67.) In a related action, this Court denied Plaintiff Irene Grace's Motion for Preliminary Certification as a Collective Action by Order dated September 6, 2007. (3:06cv306, Doc. No. 78.) On July 9, 2009, this Court granted Defendant's Motion for Summary Judgment as to Ms. Grace's case and dismissed Ms. Grace from the action. (3:08md1932, Doc. No. 172.) Ms. Grace appealed both orders to the Fourth Circuit Court of Appeals. The Court of Appeals held that Ms. Grace was a manager and therefore affirmed this Court's judgment in favor of Family Dollar Stores, Inc. *See Grace v. Family Dollar Stores Inc.*, 637 F.3d 508 (4th Cir. 2011).

1

# FACTS[2]

Plaintiff, Sally Villanueva ("Villanueva"), was employed by Family Dollar Stores from November of 1998 until August of 2007.[3] Villanueva began her employment as a clerk for Store 1906 in Seguin, Texas, but she was promoted only two weeks later to Assistant Store Manager. (Doc. No. 265, Villanueva Deposition at 54-60, July 2, 2009.) On June 3, 2001, Villanueva was promoted to store manager of the Gonzales, Texas store, Store 3276, and received $500 per week as her initial salary. (Doc. No. 265, Villanueva Dep. at 62:4-9, 64:20-25.) On August 25, 2001, Villanueva transferred to the Austin store and received a pay increase to $760 a week. (*Id*. at 67:15-20, 75:1-7.) Finally, Villanueva transferred back to Seguin, and she received an additional pay increase to $815 per week. (*Id*. at 67:21-25, 68:1-5.)

As store manager, Villanueva was the only store employee eligible to receive bonuses, and she admitted that she received a bonus each year she was employed as a Store Manager. (*Id*. at 127:5-7, 305:15-18, 309:1-9.) Villanueva admitted that part of her job as Store Manager was to increase sales, reduce controllable expenses, budget payroll, maintain store standards, set priorities, and direct her associates. (*Id*. at 106-112.) Villanueva's performance evaluation, which controlled her pay raises and annual bonus, depended directly on her competently

---

[2] To the extent Plaintiff makes any factual assertions based on the decision in *Morgan v. Family Dollar Stores, Inc.*, the Court will disregard such assertions. The Court will also disregard exhibits based on the *Morgan* case. In *Grace v. Family Dollar Stores, Inc.*, the Fourth Circuit Court of Appeals rejected Ms. Grace's argument that the facts in *Morgan* and in her case were identical; similarly, this Court finds no basis to support the assumption that the facts between Plaintiff's case and the *Morgan* case are the same. *See Grace v. Family Dollar Stores, Inc.*, 637 F.3d 508, 518 (4th Cir. 2011) (finding that potential variations between store size, store inventory, and the individual responsibilities of managers, as well as differences in managers' performance of exempt and nonexempt duties and the supervisory activity of district managers, precluded Plaintiff's argument that the facts in *Morgan* and in her case were identical).

[3] Villanueva filed her opt-in consent form on September 29, 2006. Accordingly, September 29, 2003, or three years from her opt-in date, through the end of her employment at Family Dollar in August of 2007, represents the longest possible relevant time period for Villanueva's claims in this action.

handling these responsibilities. (*Id*. at 106-112, 126:14-25, 127.) She admitted to receiving a $2,962.83 bonus, coupled with a $35 a week pay raise, after receiving an outstanding evaluation from her District Manager while managing the Austin, Texas store. (Doc. No. 265, Villanueva Dep. at 127:17-25.)

It is undisputed that Villanueva did not have the ultimate decision-making authority to hire, fire, or promote an employee. Nonetheless, Villanueva assessed the hiring needs of each of her stores whenever a position in her store became vacant. (*Id.* at 147:8-25, 148-152.) Villanueva testified in her deposition that she regularly interviewed and provided recommendations as to the hiring of her employees. (*Id.* at 93-96.) She also administered both the Stanton test and the drug test to each of her prospective employees. (*Id.* at 93:20-25, 94-97, 98:1-11.) Villanueva admitted that when she telephoned her District Manager to update him on a prospective employee's successful test results, he would then allow her to hire the employee. (*Id*. at 151:22-25, 152:1-2.)

After hiring a new employee, Villanueva completed the new-hire paperwork and began training her new employee. (*Id.* at 156:23-25, 157-160.) Villanueva offered Gloria Rangel an assistant manager position at the Seguin store prior to consulting with her District Manager. (Doc. No. 265, Villanueva Dep. at 100:9-25, 183:16-25, 184.) In fact, Villanueva's District Manager approved her decision to hire Ms. Rangel despite the fact that Ms. Rangel failed the Stanton test. (*Id.* at 185:1-13.) She also negotiated a raise for Gloria when she discovered that Gloria was interviewing for a higher paying job with another company. (*Id.* at 236:16-25, 237:1-19.) Villanueva disciplined her employees by counseling them in order to correct their mistakes.

3

(*Id.* at 358:24-25, 359:1-9, 360:2-19.)  She  also wrote up employees when they did not follow company policy.  (*Id.* at 89:2-8, 164:15-18, 194:20-25, 201:7-21.)

As store manager, Villanueva trained employees "to teach, coach, and train" and to succeed.  (*Id.* at 211:16-21, 214:15-16, 270:23-25, 271:1-14, 304:8-21, 310:19-21.)  She testified that the employees she trained worked well.  (Doc. No. 265, Villanueva Dep. at 289:16-17.)  As a Certified Training Manager ("CTM"), Villanueva trained newly hired or promoted store managers both in her store and in the new manager's location.  (*Id.* at 170:7-9, 175:22-25, 176:1-21, 347:10-18.)  Villanueva secured back-up support and delegated tasks to her Assistant Manager in order to secure the store while she was away from her store training a new manager.  (*Id.* at 365:16-25.)

Villanueva maintained employee files, reviewed audit journals, and monitored employees' time.  (*Id.* at 203:20-25, 204, 205:1, 235:1-25.)  She was responsible for completing warehouse transfers, store transfers, sales tracking logs, and inventory logs.  (*Id*. at 274:1-21, 290:1-12.)  While managing the Austin store, her District Manager visited her store once a week for roughly an hour to an hour and a half each visit.[4]  (*Id.* at 137:7-19.)  Finally, in her Seguin store, the District Manager visited once a week for roughly forty-five minutes each visit.  (Doc. No. 265, Villanueva Dep. at 138:21-25, 139:1-16.)  Michelle Debrocq (Debrocq), a Family Dollar Employee, testified that the district managers for the two stores in which Villaneuva

---

[4] Family Dollar alleges, *inter alia*, that Villanueva was relatively free from supervision because her district manager's office was over two hours away from the Gonzales store, and therefore her district manager could only visit the store twice a month. (Doc. No. 264 at 17.)  Plaintiff's time at the Gonzales store, however, is inapplicable according to her calculated opt-in date; therefore, this Court will only apply its analysis to Plaintiff's manager position in the Austin store, beginning September 29, 2003, through her date of transfer, June 2004, as well as her time as manager of the Seguin store.  *See supra* fn. 3.

4

worked were responsible for districts that encompassed anywhere between fourteen to forty-two stores and spanned anywhere from forty-seven to two hundred and thirteen miles. (Doc. No. 265, Debrocq Declaration ¶ 4, July 31, 2009.)[5]

Villanueva testified in her deposition that she spent ninety-five percent of her time unloading trucks, stocking shelves, working the aisles, cleaning the store, running the register, and checking inventory. (Doc. No. 265, Villanueva Dep. at 319:24-25, 320:1-23.) However, she spent an hour prior to the store's opening and roughly two to three hours after the store's closing tending to managerial duties. (*Id.* at 344:23-25, 345:1-7.) Villanueva admitted that as store manager she also tended to customer complaints and maintained store safety. (*Id.* at 268:1-23, 283:24-25, 284:1-17, 298:16-25, 299, 300, 301, 302:1-7.) Villanueva testified that customer safety issues, such as cleaning up spills, could happen "[a]ny time during the day," and that she had to remain "aware of what's going on." (*Id.* at 295:21-25, 296:1-24.) Villanueva conceded that she used a preprinted schedule to plug in her employees' names, but she could deviate in order to accommodate for employee illness and/or vacation time. (*Id.* at 112:21-25, 113-116, 117:1-3.) Villanueva testified that she preferred to unload the truck herself because she wanted to personally keep track of her store's merchandise orders and inventory. (*Id.* at 173:16-25.) In the event that another store received her order in error, she was able to immediately correct the mistake. (Doc. No. 265, Villanueva Dep. at 173:21-25, 174:1-8.)

---

[5] The Court is aware that Plaintiff objects to the admissibility of Debrocq's declaration as it relates to the "two full time employees or their equivalent" and "significant salary difference" prongs of the executive exemption. Plaintiff did not object to the admissibility of the Debrocq declaration, however, as it relates to the territory of Plaintiff's district managers. Moreover, by Order dated August 10, 2011, the undersigned concluded that the declarations of Family Dollar employees regarding the "two full time employees or their equivalent" and "significant salary difference" prongs of the executive exemption were admissible. Significantly, Plaintiffs failed to file a response to Family Dollar's supplemental briefing on this issue despite being given thirty days to do so by the Court. (Doc. No. 590.)

In her response, Villanueva testified that, aside from herself, there were two or more full time employees working in her stores. (Doc. No. 353 at 8, fn.3.) In her testimony, Villanueva admitted that she did a great job at directing associates and setting priorities. (Doc. No. 265, Villanueva Dep. at 112:2-13.) She also testified that she directed her employees' workload. (*Id.* at 19-22.) Villanueva asserted that rather than telling her employees what to do, she would ask her employee's to assist her with the workload. (*Id.* at 78:18-25, 79, 80.) She believed this was a more effective approach because you can "get more people with honey than you do with . . . being mean and ugly." (*Id*. at 80:16-20.)

## STANDARD OF REVIEW

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party always bears the initial burden of "informing the district court of the basis for its motion," and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant has met the initial burden, "the non-moving party 'may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). This is particularly important where the nonmoving party bears the burden of proof. *Hughes*, 48 F.3d at 1381. A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249-50.

The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict.

When considering summary judgment motions, courts must view the facts in the light most favorable to the party opposing the motion. *Austin v. Clark Equip. Co.*, 48 F.3d 833, 835 (4th Cir. 1995). In reviewing the whole record, the Court must remember to "disregard all evidence favorable to the moving party that the jury is not required to believe" and therefore only "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that [the] evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

## DISCUSSION

The Fair Labor Standards Act ("FLSA") requires that an employee receive overtime pay if he or she works more than forty hours a week. 29 U.S.C. § 207(a)(1). However, the statute exempts from this requirement "any employee employed in a bona fide executive…capacity." 29 U.S.C. § 213(a)(1). The Department of Labor ("DOL") has promulgated regulations which further describe and interpret the scope of this exemption. Due to the time span of Villanueva's claims, two different sets of DOL regulations apply to this analysis: the regulations in effect prior to August 23, 2004 (the pre-2004 regulations) and the regulations that went into effect on August 23, 2004 (the current regulations).[6]

The pre-2004 regulations set forth both a "short" and "long" test for determination whether an employee qualifies as an exempt executive. *See* 29 C.F.R. 541.1 (pre-2004). The

---

[6] The Pre-2004 regulations apply to her employment from September 23, 2003 through August 22, 2004. The Current regulations apply to her employment from August 23, 2004 through August 2007.

short test is used for employees who are compensated on a salary basis at a rate of at least $250 per week. 29 C.F.R. 541.1(f) (pre-2004). It is undisputed that Villanueva earned a salary of more than $250 per week during the relevant time period. Accordingly, the short test is the appropriate method for determining whether Villanueva was properly classified as exempt.[7] Under the short test, an employee qualifies as an executive if (1) his or her primary duty consists of management of the enterprise and (2) includes the customary and regular direction of the work of two of more other employees. 29 C.F.R. 541.119(a) (pre-2004); 29 C.F.R. 541.1(f) (pre-2004). Similarly, the current regulations went into effect on August 23, 2004, and should also be applied to this analysis. The current regulations provide that an employee qualifies as an executive if: (1) he or she is compensated on a salary basis at a rate of at least $455 per week: (2) his or her primary duty is management of the enterprise; (3) he or she customarily and regularly directs the work of two or more other employees; and (4) he or she has the authority to hire or fire other employees or his or her suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a).

1. **Family Dollar Satisfies the Salary Basis Test**

Family Dollar satisfies the salary basis test under both the pre-2004 regulations, which require a weekly salary of not less than $250 per week under the short test, and the current regulations, which require a weekly salary of not less than $455 per week. 29 C.F.R. § 541.100;

---

[7] The "long" test found in the pre-2004 regulations includes six factors. Section 541.1(f) states clearly, however, that an employee who is compensated for his or her services on a salary basis of at least $250 per week and who satisfies the tests promulgated by sections 541.1(a)-(b) shall be deemed to meet all other requirements under that section. 29 C.F.R. § 541.1(f) (pre-2004).

29 C.F.R. 541.1(f) (pre-2004). Villanueva concedes this element in her Response to Defendant's Motion for Summary Judgment. (Doc. No. 353 at 8, fn.3.)

### 2. Family Dollar Satisfies the Primary Duty Test

The regulations provide guidance as to how an employee's primary duty may be determined. Both sets of regulations instruct that the determination should be "based on all the facts in a particular case." 29 C.F.R. § 541.103 (pre-2004).

The pre-2004 regulations set forth five factors to consider in this analysis: (1) the amount of time spent in the performance of managerial duties; (2) the relative importance of the managerial duties as compared with other types of duties; (3) the frequency with which the manager exercises discretionary powers; (4) the manager's relative freedom from supervision; and (5) the relationship between the manager's salary and the wages paid to other employees for the kind of nonexempt work performed by the supervisor. 29 C.F.R. § 541.103 (pre-2004).[8]

Upon consideration of the five factors identified for determining whether Villanueva's primary duty was management, the Court concludes that the factors are readily satisfied.

#### a. The Amount of Time Spent in the Performance of Managerial Duties

Villanueva cannot defeat the exemption by claiming that she spent the majority of her time performing non-managerial duties. The current regulations provide a list of "management" activities, which include but are not limited to:

---

[8] The current regulations omit reference to the frequency with which the manager exercises discretionary powers. 29 C.F.R. § 541.700.

> Interviewing, selecting and training of employees; setting and adjusting their rates of pay and hours of work; directing their work; maintaining their production or sales records for use in supervision or control; appraising their productivity and efficiency for the purpose of recommending promotions or other changes in their status; handling their complaints and grievances and disciplining them when necessary; planning the work; determining the techniques to be used; apportioning the work among the workers; determining the type of materials, supplies, machinery or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety of the [employees] and the property; planning and controlling the budget; monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. In Villanueva's deposition, Villanueva explicitly testified that she regularly performed almost every one of these management activities. (Doc. No. 265, Villanueva Dep. at 19-22, 93:20-25, 94-97, 98:1-11, 112:21-25, 113-116, 117:1-3, 156:23-25, 157-160, 170:7-9, 175:22-25, 176:1-21, 268:1-23, 283:24-25, 284:1-17, 298:16-25, 299, 300, 301, 302:1-7, 347:10-18, 358:24-25, 359:1-9, 360:2-19.) The regulations state that an employee who spends more than fifty percent of his or her time performing managerial work will typically satisfy the primary duty requirement. 29 C.F.R. § 541.700(b). The regulations also emphasize, however, that "time alone…is not the sole test" and that exempt executives are not required to spend more than fifty percent of their time performing exempt work if other factors support the conclusion that management is their primary duty. *Id; see also Grace v. Family Dollar Stores, Inc.,* 637 F.3d 508, 515 (4th Cir. 2011).

Furthermore, the regulations specifically address the concept of concurrent duties. Concurrent performance, or multi-tasking, of exempt and nonexempt work is explicitly recognized as a managerial duty by the DOL's regulations. 29 C.F.R. § 541.106; *see also* 29 C.F.R. § 541.103 (pre-2004) (stating that a manager will be considered to have management as his or her primary duty, although the manager spends more than fifty percent of his or her time

10

performing non-exempt tasks, where "[w]hile engaged in such work [the manager] supervises other employees . . . handles customer complaints . . . or performs other management duties as the day to day operations require") *and* 29 U.S.C. § 213(a)(1).[9] As the Fourth Circuit Court of Appeals stated in *Grace*, "It is misleading simply to add up the time that [Plaintiff] spent unloading trucks, stocking inventory, running cash registers, or sweeping floors and conclude thereby that she was merely a clerk and not a manager." *Grace,* 637 F.3d at 516.

Villanueva was responsible for the management of her stores the entire time she was present in her stores. According to Villanueva, she was the boss and the team leader of her store. (Doc. No. 265, Villanueva Dep. at 218:16-17, 233:8-12, 272:12-14, 306:17-20.) Villanueva testified that she was responsible for organizing her employees with regard to directing workload. (*Id.* at 112:8-12, 124:19-22.) She also testified that she maintained store safety. (*Id.* at 283:24-25, 284:1-17.) Villanueva testified that customer safety issues, such as cleaning up spills, could happen "[a]ny time during the day," and that she had to remain "aware of what's going on." (*Id.* at 295:21-25, 296:1-24.) She also testified that her employees relied on her to do well because she "was the store manager . . .[and] put there to help them succeed." (*Id.* at 310:17-21.)

Moreover, Villanueva performed her non-managerial work concurrently with her exempt managerial work. For example, Villanueva preferred to unload the truck herself because she wanted to personally keep track of her store's merchandise orders and inventory. (*Id.* at 173:16-25.) In the event that another store received her order in error, she was able to immediately correct the mistake. (Doc. No. 265, Villanueva Dep. at 173:21-25, 174:1-8.) Therefore, even

---

[9] The FLSA recognizes the nature of retail business and states that "an employee of a retail or service establishment shall not be excluded from the definition of an employee employed in a bona fide executive or administrative capacity because of the number of hours in his work week which he devotes to activities not directly or closely related to the performance of executive or administrative activities." 29 U.S.C. § 213(a)(1).

though the act of unloading the truck would not be considered exempt work in itself, Villanueva's concurrent performance of controlling store inventory while unloading the truck was the performance of a managerial duty. Similarly, in *Grace,* the plaintiff testified that she would look at the condition of the front end of the store and keep an eye out for theft while running the cash register. *Grace*, 637 F.3d at 516. The Fourth Circuit Court of Appeals found this concurrent performance of exempt and non-exempt tasks to be the performance of a managerial duty, stating that the plaintiff "was performing management duties whenever she was in the store, even though she also devoted most of her time to doing the mundane physical activities necessary for its successful operation." *Id.* at 515-17.

### b. The Relative Importance of the Managerial Duties as Compared with Other Types of Duties

Villanueva's managerial duties are more important than the other duties that she performed. Court's evaluate the relative importance of an employee's managerial duties by measuring "the significance of the managerial tasks to the success of the facility." *Jones v. Virginia Oil Co.*, 69 F. App'x 633, 683 (4th Cir. 2003). When Villanueva started as a Store Manager she understood that she would be responsible for "everything that needed to be done inside that—those four walls . . . ." (Doc. No. 265, Villanueva Dep. at 68:9-10.) Villanueva admitted that part of her job as Store Manager was to increase sales, reduce controllable expenses, budget payroll, maintain store standards, set priorities, and direct her associates. (*Id*. at 106-112.) Villanueva's performance evaluation, which controlled her pay raises and annual bonus, depended directly on her competently handling these responsibilities. (*Id*. at 106-112, 126:14-25, 127.) Villanueva also testified that once she started managing the Seguin store, she

reduced shrink from 9.86% to 2.4% by retraining and supervising her new associates. (*Id.* at 270:8-24.) Villanueva's responsibilities are among those that the Fourth Circuit finds "critical to the success" of the facility. *Jones*, 69 F. App'x at 638. Thus, Family Dollar could not have operated successfully without the functions performed by Villanueva.

### c. Villanueva's Relative Freedom from Supervision

Villanueva was relatively free from supervision in managing her stores. In *Grace*, the Fourth Circuit Court of Appeals found the plaintiff to be relatively free from supervision where the plaintiff's supervising district manager typically visited the store once every two to three weeks. *Grace*, 637 F.3d at 517. The court also noted, apart from his supervision, which was not uncharacteristic for any retail operation, the district manager was not a "micro-manager who constantly was looking over her shoulder." *Id.* The supervision of seventeen stores would hardly permit him to micro-manage all of them. *Id*.

According to Michelle Debrocq, a Family Dollar Employee, the district managers for the two stores in which Villaneuva worked during the relevant time period were responsible for districts that encompassed anywhere from fourteen to forty-two stores and spanned anywhere from forty-seven to two hundred and thirteen miles. (Doc. No. 265, Debrocq Decl. ¶ 4.) Accordingly, Villanueva testified that during her time at the Austin store, her district manager was only able to visit once a week for roughly an hour to an hour and a half each visit.[10] (Doc. No. 265, Villanueva Dep. at 137:7-19, 138:16-20.) While managing the Seguin store, Villanueva's district manager stopped by her store once a week for roughly forty-five minutes each visit. (*Id.* at 138:21-25, 139:1-16.) Although Villanueva communicated with her district

---

[10] During her employment at the Austin store, Villanueva's District Manager changed numerous times. (Doc. No. 265, Villanueva Dep. at 135.).

managers by telephone whenever necessary and received daily emails from corporate, she does not allege that her district managers were micro-managers who were constantly looking over her shoulder. (*Id.* at 329:1-14.) Moreover, courts have found that "frequent, even daily exchange of e-mail and phone communications" between store managers and district managers "does not equate to exacting supervision." *See Thomas v. Speedway SuperAmerica LLC*, 506 F.3d 496, 508 (6th Cir. 2007).

Courts have found that employees were relatively free from supervision in circumstances where the exempt executive was subject to substantially greater oversight than Villanueva. In *Thomas*, a district manager who typically visited each store once or twice per week and communicated frequently by phone and email, supervised the plaintiff store manager. *Id.* at 499, 507. The court also noted that "[i]n addition to stringent managerial oversight, Speedway has also adopted detailed company policies and standardized operating procedures, as an additional means of fostering consistency through its multi-store organization." *Id.* Nevertheless, the Sixth Circuit found that the plaintiff was relatively free from supervision, recognizing that the factor "does not demand complete freedom from supervision" and noting that the plaintiff operated on a day-to-day basis without a supervisor looking over her shoulder. *Id.*

### d. The Relationship Between Villanueva's Salary and the Wages Paid to Other Employees for the Kind of Nonexempt Work Performed by the Supervisor

To determine the relationship between a managerial salary and wages paid to nonmanagerial employees, the Fourth Circuit considered, first, whether the manager earned more in absolute terms than nonmanagerial employees and, second, whether the manager was a

"profit center." *Grace*, 637 F.3d at 517. This second consideration asks whether the manager had the ability to influence the amount of his or her compensation. *Id.*

First, Villanueva earned significantly more than her non-exempt store employees in absolute terms. When she started in Austin in August of 2001, Family Dollar paid Villanueva a salary of $760 per week. (Doc. No. 265, Villanueva Dep. 67:18-20, 134:10-16.) During her time in Austin, Villanueva received a pay raise to $795 per week. (*Id*. at 126:10-25, 127, 340:1-7.) Villanueva received another pay raise to $815 per week when she transferred back to Seguin. (*Id.* at 68:2-5.) As Store Manager, she was the only employee in her store who received annual bonuses. (*Id.* at 127, 305:15-24, 338:23-25, 339:1-3.) Asserting she did not record all of her hours, Villanueva testified that she worked an average of 65 to 75 hours per week in Austin. (*Id.* at 315:12-17.) In Seguin, Villanueva worked an average of 55 to 65 hours per week. (*Id.* at 220:12-19.) Setting aside bonus payments, this results in an average hourly wage between $10.60 per hour (65 hour week) and $12.23 per hour (75 hour week) while managing the Austin store during the period of September 29, 2003, to June of 2004. She earned an average hourly wage between $12.54 per hour (65 hour week) and $14.81 per hour (55 hour week) while managing the Seguin for the period of June 2004 until her resignation in August of 2007.

In comparison, Villanueva testified that her assistant store manager, Gloria Rangel, earned $10 an hour at the Seguin store whereas, at minimum, Villanueva earned $12.54 an hour. (Doc. No. 265, Villanueva Dep. at 219:12-13.) She also testified that her Austin store lost several employees to McDonald's because McDonald's paid $8 per hour and Family Dollar only paid between $6 and $7 per hour. (*Id.* at 154:12-17.) Furthermore, according to Michelle Debrocq, a Family Dollar employee, approximately 35 of the 47 hourly employees who worked under

15

Villaneuva during the relevant time period earned $7 per hour or less, and, using the highest hourly wage for those employees whose wages changed over time, the hourly employees working for Villanueva's stores received an average hourly wage of $6.93 per hour. (Doc. No. 265, Debrocq Decl. ¶ 8.) This average is significantly less in absolute terms than Villanueva's average salary during the relevant time period.

Second, Villanueva was a "profit center." Villanueva admitted that part of her job as store manager was to increase sales, reduce controllable expenses, budget payroll, maintain store standards, set priorities, and direct her associates. (Doc. No. 265, Villanueva Dep. at 106-112.) Villanueva's performance evaluation, which controlled her pay raises and annual bonus, depended directly on her competently handling these responsibilities. (*Id*. at 106-112, 126:14-25, 127.) Similarly, in *Grace*, the Fourth Circuit found Ms. Grace to be a "profit center" because her "performance evaluation, salary, and bonus depended on her store's profitability." *Grace*, 637 F.3d at 517.

> e. **The Frequency With Which the Employee Exercises Discretionary Powers**

Villanueva frequently exercised discretion in performing her managerial duties. In *Grace*, the Fourth Circuit Court of Appeals found that the plaintiff exercised discretion frequently by making such day-to-day decisions as "[h]ow to handle a customer complaint or employee complaint, how to adjust a schedule, how to arrange the stock in a manner that was pleasing, what task to address first, [and] how to keep a mindful eye on shrinkage and breakage while at the same time satisfying customers . . . ." *Id.* at 517. The Court reasoned that "[e]very one of [the plaintiff's] day-today [sic] tasks involved judgment and discretion" and that "all [of the plaintiff's tasks] involved discretionary acts inherent in being responsible for the successful operation of a retail store." *Id.*

16

Similar to the plaintiff in *Grace*, Villanueva performed many day-to-day tasks that required her judgment and discretion and that were critical to the operation of her store. For example, Villanueva interviewed and provided recommendations as to the hiring of employees, and she had discretion in terms of assigning employees to the schedule and increasing or reducing their hours. (Doc. No. 265, Villanueva Dep. at 93:20-25, 95-98, 114:14-25, 115, 116:20-22.) Furthermore, Villanueva exercised discretion when setting priorities, directing workload, and planning on things to do daily and weekly within her store. (*Id.* at 112: 2-20, 124:19-22, 125:5-7.) Moreover, Villanueva exercised discretion when dealing with customer complaints and fulfilling customer needs. (*Id.* at 125:17-19, 142:6-25, 143-145, 298:16-25, 299.) She also used discretion when arranging her store's product display by opting to fill empty shelves in order to boost her store's sales. (*Id.* at 277:4-25, 288:1-22, 327:16-25, 328:1-5.) The fact that Family Dollar maintained certain policies and procedures for the sake of consistency does not mean that Villanueva failed to exercise discretion in carrying out such policies or in being responsible for the successful operation of her store.

### 3. Villanueva Customarily and Regularly Directed the Work of Two or More Employees

Both regulations require that an employee customarily and regularly direct the work of two or more other employees to qualify as an executive. 29 C.F.R. § 541.100(a)(3); 29 C.F.R. 541.1 (pre-2004). The regulations state that the phrase "customarily and regularly" means "a frequency that [is] greater than occasional but . . . may be less than constant." 29 C.F.R. § 541.701. As a general rule of thumb, the DOL has adopted an "eighty-hour rule" which generally requires an exempt executive to direct a total of eighty employee-hours of work each week. *See* 69 Fed. Reg. 22135. Villanueva admitted to managing at least two full-time

17

employees in her Response to Defendant's Motion for Summary Judgment, but she argues that she did not direct these employees. (Doc. No. 353 at 8, fn.3) However, in her deposition, Villanueva testified that she directed the workload in her store and was the leader of her team. (Doc. No. 265, Villanueva Dep. at 124:19-22, 272:12-14.) Villanueva lead by example and opted for what she believed to be a more effective management approach. (*Id.* at 306:17-20, 80:11-25, 81:1-5.) She testified that she asked for help rather than telling her employees what to do. (*Id.* at 80:11-25, 81:1-5, 82:5-17.)

Villanueva also maintains that her assistant store managers' ("ASM") authority was equivalent to her authority. (Doc. No. 265, Villanueva Dep. at 310:24-25, 311-314.) However, Villanueva testified that, not only was she responsible for training ASMs, she hired Gloria Rangel as her ASM because "she followed orders." (*Id.* at 101:3-24, 347:10-18, 363:15-25.) Furthermore, although Villanueva testified that her ASMs ran the store while she was away on Certified Training Manager ("CTM") assignments, she admitted that she was responsible for ensuring the store was in good hands prior to leaving her store. (*Id.* at 364:9-15, 365:16-25.) Ultimately, the facts show that Villanueva was the team leader and that she utilized her own management style to ensure the successful operation of the store. Therefore, the Court finds that Villanueva did, in fact, customarily and regularly direct at least two full-time employees during the relevant time period.

### 4. Villanueva Had Authority and Discretion with Regard to Interviewing and Hiring and Her Recommendations Were Closely Followed

Villanueva's deposition testimony establishes that she meets the additional prong of the executive exemption test contained in the current regulations, namely that her suggestions as to

18

the hiring, firing, or change of status of other employees were given particular weight. 29 C.F.R. § 541.100(a)(4). Villanueva was actively involved in the interviewing and employee screening process, her district manager followed her recommendations, and she was in charge of communicating offers of employment. (Doc. No. 265, Villanueva Dep. at 93:23-25, 94:1-4, 95:9-25, 96, 97, 98:1-15.) As store manager, Villanueva assessed the hiring needs of each of her stores. (*Id*. at 147-149.) Villanueva conducted interviews, checked references, administered company tests, carried out drug and alcohol screenings, and gave offers of employment. (*Id*. at 93:23-25, 94:1-4, 95:1-25, 96, 97, 151, 153:12-19.) In fact, Gloria Rangel was hired as an Assistant Store Manager without passing the Stanton test due to Villanueva's recommendation. (*Id*. at 100:14-17, 101, 184, 185.) Villanueva also persuaded her District Manager to give Gloria a pay raise in order to keep her from leaving the company. (*Id.* at 236:16-25, 237.)

With respect to disciplining employees, Villanueva corrected her employees' mistakes through counseling. (*Id.* at 360:2-19.) An employee was written up if he or she did not follow store policy, and Villanueva admitted to writing up at least one employee on more than one occasion. (Doc. No. 265, Villanueva Dep. at 164:15-22, 199:24-25, 201:7-9, 288:10-13.) Overall, while Villanueva did not have the ultimate decision-making authority with respect to hiring, firing, or change of employment status, she made frequent recommendations as to those matters, and her recommendations were almost always followed, thereby satisfying the requirement.

## **CONCLUSION**

Viewing the facts in the light most favorable to the non-moving party, the Court finds that Family Dollar has satisfied the DOL regulations, thereby establishing that Villanueva qualifies

19

as an exempt executive under the FLSA. Therefore, Family Dollar is entitled to judgment as a matter of law.

## **ORDER**

IT IS ORDERED that:

(1) Defendant's Motion for Summary Judgment is GRANTED and Plaintiff Sally Villanueva is dismissed;

(2) The Court finds that there is no just reason to delay finding of final judgment for Family Dollar with regard to Plaintiff Sally Villanueva's claim against Family Dollar;

(3) The Clerk is directed to enter final judgment, pursuant to Rule 54(b), for Family Dollar with regard to Plaintiff Sally Villanueva.

**SO ORDERED.**

Signed: October 14, 2011

Graham C. Mullen
United States District Judge